UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION ASSOCIATED WITH **FACEBOOK USER ID 730591804** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. ___5:20mj8___ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Stephen J. Duenas, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the **Facebook User ID 730591804**.

2.     I am a Special Agent with the Federal Bureau of Investigation, and have been since January 2000. I have participated in numerous criminal investigations focused on firearms, armed drug trafficking violations, criminal street gangs and kidnappings. I have investigated violations of Title 18, United States Code, Section 1201 (Kidnapping), Title 18, United States Code, Section 1512 (Tampering with Witnesses), and Title 18 United States Code 924 (Weapons Offenses). I have experience in the investigation, apprehension and prosecution of individuals involved in firearms offenses, violent criminal

offenses and kidnapping. I have also been trained on the use of cellular and electronic devices to include performing forensic examinations on such devices.

3.　　　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.　　　Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that multiple violations of Title 18, United States Code, Section 1201 (Kidnapping), Title 18, United States Code, Section 1512(k) (Conspiracy to Kill Witnesses), and Title 18, United States Code, Section 924(c) (brandishing firearm during commission of a crime of violence), by the individuals listed herein. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.　　　On July 29, 2018, shortly before 11:30 PM, Parents A and B, who are husband and wife, were in their residence with their two daughters at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Dayton, Virginia, which is located within the Western District of Virginia. The two daughters were ages two years old and eight months old, respectively, and were asleep in their rooms. Parents A and B are of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At that time Parent A and Parent B observed a vehicle pull up to their home. Three subjects, two males and a female approached the home and were greeted by Parent A. When Parent A observed that one of the subjects possessed a handgun, Parent A

2

attempted to shut the door and prevent the subjects from entering his home. The subjects, however, forced their way into the home.

6.      Parent B observed this activity and grabbed the cordless phone, ran from the home, and called 911 to report the home invasion. A deputy with the Rockingham County Sheriff's Office (RCSO) was nearby and responded to the call. Upon arrival, the RCSO deputy made contact with Parent B and obtained a brief explanation of what had taken place. Two of the subjects were also out in the yard of the property when the RCSO deputy made contact with Parent B. According to Parent B, she was too frightened to tell the RCSO deputy that these people were involved in the offense fearing that they might shoot him.

7.      Without knowing their involvement and believing them to be mere bystanders or neighbors, the RCSO deputy requested that the two subjects transport Parent B to the nearby Krossroads Kountry Store where she would be safe. The two subjects complied, and after dropping Parent B off, fled the scene. The FBI has obtained footage from the RCSO deputy's dashboard camera, which contained portions depicting the two subjects. Upon review of that footage, the two subjects appear to be consistent with Valerie Hayes and Gary Reburn in build, physical characteristics, and likeness.

8.      After speaking with Parent B, the mother of the two potential abductees, law enforcement subsequently obtained and reviewed security video from the Krossroads Kountry Store on the night of July 29, 2018, where she had been dropped off by two of the subjects. The video depicts a silver Mercedes Benz SUV.

9.      The RCSO deputy then entered the home and safely retrieved the two daughters. The RCSO deputy continued to search the home and found Parent A lying on the basement floor with his wrists bound behind his back with zip ties. The RCSO deputy observed a male with a handgun hiding

3

under the stairs in the basement, pointing the gun at Parent A. The RCSO deputy took this subject, later identified as Frank Amnott, into custody. Other law enforcement responded to the scene and began a comprehensive investigation. Parents A and B confirmed that three subjects were involved in the home invasion and that both of the males were armed with handguns. Parent A was interviewed and advised that after the suspects entered the home, he was escorted by both armed male suspects, to the basement. Once in the basement, the subjects ordered him to the ground and bound his hands, with zip ties, behind his back. The second male suspect then went upstairs. Parent A could hear movement upstairs and believed he could hear his oldest child making a sound.

10. Soon after Frank Amnott was incarcerated in the Rockingham County Jail, law enforcement reviewed the calls he had made from jail. Frank Amnott had contacted the phone number 202-329-2792. An investigator with RCSO called that number and spoke with Jennifer Amnott, who is Frank's wife (Jennifer). She was evasive and told the RCSO investigator that she was in a location at which law enforcement could not get to her. According to the RCSO investigator, Jennifer did not appear to be surprised that Frank had been arrested and she did not seem to be surprised about the charges against her husband.[1]

11. Interviews with family members of the Frank and Jennifer Amnott revealed that the Amnotts were living in Florida had been trying to conceive and adopt children but everything they

---

[1] Frank Amnott was charged with Burglary at night to commit felony armed conspiracy a violation of the Code of Virginia 18.2-22/18.2-89, (two counts), Use of a firearm in the commission of a felony a violation of the Code of Virginia 18.2-53.1(six counts), Abduction by force, a violation of the Code of Virginia 18.2-22/18.2-47(two counts), Attempted Robbery, a violation of the Code of Virginia 18.2-26/ 18.2-58, Conspiracy to commit Robbery, a violation of the code of Virginia 18.2-22/18.2-58, Brandishing a Firearm, a violation of the Code of Virginia 18.2-482. He was subsequently charged in the United States District Court for the Western District of Virginia on three counts: (1) Conspiracy to Kill Witnesses, in violation of 18 U.S.C. § 1512(k); (2) Conspiracy to Kidnap, in violation of 18

had attempted has failed. These family members have informed law enforcement that the Amnotts were introduced to Valerie Hayes because Hayes could facilitate their locating and adopting a baby.

12.    In its investigation, the FBI has obtained and reviewed a copy of Jennifer Amnott's diary (the diary). The diary reveals, among other things, that Jennifer and Frank Amnott were introduced to Valerie Hayes through a mutual friend. Valerie Hayes promise the Amnotts that she could get them children. According to the diary, the Amnotts paid Valerie Hayes substantial sums of money for adoptions of young children, none of which was successful. It also appears, according to the diary, that Valerie Hayes at some point represented herself to the Amnotts as working for British Intelligence Services and, as part of this employment, she claimed that she could somehow obtain access and provide children who had "nowhere to go" or who otherwise were victims of abuse or neglect.

13.    Search warrants were served to cellular phone carriers to identify the subjects involved in the home invasion. The cellular phone carriers were able to provide text message content from **202-370-7789**, a cellular phone subscribed to Frank Amnott, and from **202-329-2792**, a cellular phone subscribed to Jennifer Amnott.

14.    The search warrants revealed several different phone numbers exchanging text messages over the course of several days preceding and including July 29, 2018, the day of the

---

U.S.C. § 1201(c); and (3) Brandishing a Firearm During the Commission of a Crime of Violence, in violation of 18 U.S.C. § 924(c). On December 11, 2019, he pleaded guilty.

attempted kidnapping. The phone numbers communicating with the group and their area codes, and service providers are as follows:

| | | |
|---|---|---|
| 1-678-915-8829 | Bandwidth.com | Area Code-Atlanta, GA |
| 1-202-231-9498 | Verizon | Area Code-Washington D.C. |
| 1-443-750-1000 | Verizon | Area Code-Maryland |
| 1-301-651-9613 | Verizon | Area Code-Maryland |
| 1-240-750-5109 | Verizon | Area Code-Maryland |
| 1-202-329-2792 | Bandwidth.com | Area Code-Maryland |
| 1-202-329-2792 | Verizon | Area Code-Maryland |

15.     Through various sources, the FBI has associated each of the following numbers with the following individuals.

16.     The phone number **240-750-5109** has been associated with Valerie Hayes through numerous connections, to include that she has identified this as her phone number in sworn deposition, the number is listed in her ex-husband's phone as "Val," and public databases and open sources also link this number to her.

17.     The phone number **301-651-9613** has been associated to Gary Blake Reburn through various sources, including but not limited to the fact that the number is subscribed to by Gary Blake Reburn according to public databases; a Google search of his name includes his biography, his photograph, and lists the number below; in the text messages obtained by the search warrants, a text message from this number identifies as "Blake here." Blake is Gary Reburn's middle name.

18.     The phone number **202-329-2792** has been associated to Jennifer Amnott through various sources, including but not limited to the fact Frank Amnott called this number on July 30,

6

2018 after his arrest; and that the RCSO investigator called the number the recipient identified herself as Jennifer Amnott, and the number is listed as associated with Jennifer Amnott according to public databases. Finally, this number is listed under the name "Jen Amnott" as the emergency contact for Valerie Hayes on her passport.

19. A review of the text messages revealed a plot in which Valerie Hayes, Gary Reburn (Hayes' boyfriend), and Frank Amnott, Jennifer Amnott, and potentially others, agreed to participate in a plot to travel from Maryland to Virginia to surveil families with small children, to invade a home, and abduct the children, and that Hayes, Reburn, and Frank Amnott were the three subjects that conducted the home invasion and attempted child abduction that was thwarted by the RCSO on July 29, 2018 in Rockingham County, Virginia.

20. The text messages were being sent to and received by numerous phone numbers. Upon review of over 1000 text messages that included Jennifer Amnott (Jennifer), Frank Amnott (Frank), Hayes, and Reburn, as well as conversations between individual members of the group revealed the following:

        a. Members of the group, to include Hayes, Frank, Reburn, and possibly others, conducted surveillance of families in the area, including a family other than that of Parent A and B, which had male children.

        b. Members of the group considered getting clothes for the children in advance of the planned kidnapping. On July 22, 2018, Hayes sent a text message to Jennifer, "you may want to get some clothes for the little boy." To which Jennifer replied that she was worried that "we won't be getting our babies. . . maybe we can go shopping with the boy on Tuesday, and let him pick out something he likes too?"

7

c. Members of the group named the children that they sought to abduct in advance. On July 22, 2018, Hayes sent a text message to Jennifer saying, "I can't remember if I told you if you're going to need to name him. To which Jennifer replied, "[Y]es, Frank chose Caleb Jesse. I am picking a second middle later. Thinking on it." According to the text messages, another child was named "Ronan." Later, on July 25, 2018, Jennifer texted Frank, "Ask V if she thinks these would fit Caleb? They're on clearance...."

d. The group had been planning the abduction for days, and they wanted to attempt the abduction on July 28, 2018 or the early morning of July 29, 2018. On July 28, 2018, Jennifer texted Frank, "So what are y'all going to do, when are you planning to attempt? Are you going to be there all day tomorrow? Have y'all had eyes on the kids." Frank responded, "Been a long night. Can't wait for it to be over." Later that same day, on July 28, 2018, Hayes texted to Jennifer, "I am going to have to pull Blake into this as I need an extra set of hands and eyes . . ." and then that "Blake is willing and ready and I'm thinking we could leave at five if Frank is willing to go. . . . We would be back by midnight as we will go in take thirty minutes or so and go out." Throughout July 28, 2018, the group continued to plan the kidnapping in the following texts: Jennifer texted Frank, ".... She needs you. But it would be her, Blake, and you." Hayes texted Jennifer, "If we go tonight . . . Three of us . . . We can get them. . . . Not one doubt in my mind or heart or faith." A few hours later, Jennifer texted Frank, "Y'all getting close?" to which Frank replied "Closer." Jennifer later told Frank, "I'm just terrified this is gonna be another there all night and come home empty handed." Frank told her, "Have a solid plan for the morning and we will see you with everyone in the morning."

8

e. The morning of July 29, 2018, the group decided to delay the abduction attempt again. Frank texted Jennifer, "Changing up again" to which Jennifer replied, "What?! What now. Please please don't' tell me it's delayed another day again. We can't keep doing this." Frank then replied, "Still today." Jennifer responded, "Just make sure you come home. And please bring our son." Hayes texted Jennifer, "we need to go after dark but when they are awake."

f. On the morning of July 29, 2018, it appears from the text message that an additional co-conspirator with an alias "Bjorn Rassmussen" (Bjorn) joined the group messages and took the lead on surveillance. Bjorn was being assisted by another individual named "Wheeler" who apparently was using drones to conduct surveillance. Reburn texted the group "B[jorn] what's going on. Any intel from wheeler and drone activity" and later that same night "We need Intel from you and wheeler. We are going in tonight . . . at dusk or just before. The same game plan as last night."[2]

g. That same morning, the group sought to locate the church attended by the Parent A and B and broke into their residence while the family was at church to observe, among other things, the size of the children's clothing and the layout of the house. Reburn texted the group, "Are we clear to go in the house?" Later, Reburn texted the group, "I just searched the house Ronan size shoes and clothes 3 rifels in the back sec[t]ion. . . 3 floor gutted Basement gutted 2nd floor storage 1sr floor kitchen bedrooms living area

---

[2]     To date, law enforcement is still investigating the identities and the extent of the involvement of "Bjorn" and "Wheeler."

laundry." Hayes texted Jennifer, who was in Maryland, "Gary and I went into the house as all are at church. . . . Ronans panties and dresses were there."

h. As night approached, the group requested any "intel" that Bjorn could provide from surveillance. Hayes texted the group, "Okay ready for intel ASAP please, sun is setting now. Everything you have then we will work with it." Bjorn replied to the group: "Okay so only one couple at the big house . . . no one supposed to come by but still do quick. . . . Ronan and Juniper [whom law enforcement infers are the children of Parent A and B] are at the big house. Second house only three boys one of them caleb he maybe seven not eight. Calm and careful getting in there because have phone maybe call police. So very careful. Lady will be very compliant." Reburn asked: "One phone or two." Bjorn replied: "Think only one. Need both in sight right away. Want lights down curtain drawn as soon as possible nosey neighbor. Use front door so dog no bark like crazy. Maybe small rifle in back porch second house. . . ."

i. As part of the plan, the group discussed the possibility of drugging the children to facilitate the abduction. Bjorn sent to the group, "Probably some things in small sewing room to blindfold and keep boys quiet after give sleepy medicine tablets."

j. Just before the home invasion around 11:30 pm on July 29, 2018, Jennifer checked in with Frank about the group's status, sending a text that said, "Y'all heard anything yet?" Frank replied to Jennifer, "Have the info, getting ready to go. . . . around dark." Later, Frank texted to Jennifer, "Love you. Shutting off."

k. Jennifer subsequently sent several frantic texts to Frank, none of which were returned because Frank Amnott had been arrested. Jennifer sent a text message to Bjorn [date/time], stating "Bjorn, please if you see this find a way to delete his fingerprints if

you can . . ." On July 31, 2018, Jennifer also sent a text message to Hayes stating, "I literally don't know what to do. . . . All I can think is I'm never seeing him again." After a delay, Jennifer texted Valerie, "Boarded," to which Valerie replied, "see you soon in Glasgow."

21.    In reviewing the text messages, agents noted that the conspirators used language potentially indicating that the potential abductees were somehow related to Valerie Hayes or the Amnotts. For example, they may refer to the children as "my" or "our" babies. Law enforcement has confirmed that the children of Parent A and B are indeed their biological children.

22.    A check of the Maryland Department of Motor Vehicles determined that, Gary Blake Reburn, residing at 4408 Brookfield Drive, Kensington, MD 20895, is the registered title holder of a silver 2011 Series 450 Mercedes Benz SUV, with Maryland License Plate 4DJ-7716. Reburn, as noted above, is the same individual associated with one of the phone numbers (301) 651-9613 and is the boyfriend of Valerie Hayes, who is associated with one of the other phone numbers.

23.    In addition to the text messages, law enforcement obtained additional evidence corroborating that the conspirators conducted surveillance of families in the area with intent to abduct children. Several individuals reported seeing a silver Mercedes Benz SUV around Dayton, Virginia with Maryland license plates on during the days prior to July 29, 2018. More specifically, in the days prior to the attempted abductions, there were seven separate complainants that recalled seeing the Mercedes or a silver SUV with Maryland license plates. Two complainants reported that they had seen the Mercedes at Parent A and B's residence on July 29, 2018, the day of the home invasion and attempted abduction. One complainant reported the vehicle was parked in the yard between 10:30 and

11:00 AM. The other complainant reported seeing the Mercedes in that driveway at about 11:15 AM and a man and woman were observed standing on the porch.[3]

24.     In the days prior to the attempted abductions, another complainant reported seeing two men and a woman in this car and one of the men described appeared to be Frank Amnott. Another complainant reported seeing a male and female occupant in the vehicle doing something on cell phones. The vehicle was observed at local businesses and residences in areas that appeared suspicious to the people that live in this area. In many cases limited or no description of the vehicle occupants was provided.

25.     Further investigation revealed that, months prior, on March 5, 2018, the RCSO received another report of a suspicious vehicle in the area. The reporting individual stated that a suspicious black Ford F150 pickup was observed at her father's residence. The RCSO made contact with the female driver, who was identified as Valerie Burns Hayes from a Maryland Operator's License and she was cited for driving on a suspended license. Valerie Burns Hayes has an alias of Valerie Perfect Hayes.

26.     Law enforcement currently knows no connection or legitimate reason as to why Frank Amnott, Gary Reburn, or Valerie Hayes would be present in a ▮▮▮▮▮▮▮▮▮▮▮ in Dayton, Virginia located in Rockingham County, Virginia. At the time of the attempted abduction, Frank Amnott resided in Florida, and Gary Reburn and Valerie Hayes resided together in Kensington,

---

[3] Notably, the text messages – as outlined above – reveal that the conspirators sought to break into Parent A and B's residence while they were at church as a step in their plot. The observation by these complainants corroborate those text messages, as the date and time of these observations of the conspirators' vehicle are consistent with when Parents A and B would be expected to be at church, that is, 10:30 to 11:15 am on a Sunday morning.

Maryland. Pursuant to court-authorized legal process, law enforcement obtained cell-site location data for the phone numbers associated with Reburn, Hayes, and Frank Amnott. Preliminary analysis confirms that those phones were located in and around the Harrisonburg/Rockingham County region of Virginia.

27. As part of its investigation, the FBI sought to review the publicly viewable Facebook account of Valerie Hayes, which contains statements and photos that she is currently residing in England with Gary Reburn. According to the United States Customs and Border Protection Agency, Hayes traveled to England from the United States on August 7, 2018 with Gary Reburn, Jonathan Dawson, (her ex-husband), and her minor children. On August 1, 2018, Jennifer Amnott traveled from the United States to Ireland. She provided conflicting statements to Ireland immigration officials that resulted in her being denied entry into Ireland. According to the most recent information obtained by the FBI, she returned to the United States and then flew to Iceland. Hayes, Reburn, and Jennifer Amnott are all United States citizens, and this travel is suspected to be an attempt to flee law enforcement authorities after Frank Amnott's arrest during the attempted abductions of July 29, 2018.

28. On November 28, 2018, Reburn, Perfect, and Jennifer Amnott were arrested in Glasgow, Scotland on a criminal complaint issued from the United States District Court in the Western District of Virginia in Glasgow, and are pending extradition.

## BACKGROUND RELATED TO FACEBOOK

29. On November 5, 2018, the Federal Bureau of Investigation obtained a search warrant from the Western District of Virginia for the Facebook account ending in #9885, which was used by Valerie Perfect Hayes. In reviewing the results from that search warrant, conversations of significant interest were identified between Hayes and Jennifer Amnott's account, 730591804 (the SUBJECT Account). These two accounts are "friends" on Facebook, and they frequently shared, liked, and

13

commented on each other's pages from September 2016 to at least July 22, 2018, which was only one week before the attempted abductions on July 29, 2018, and coincided with the time around which the Amnotts traveled from Florida to Maryland to stay with Hayes during this conspiracy.

30.     During this time frame where they were communicated, Jennifer Amnott, using the Subject account, posted to Hayes Facebook page that she had send her various messages, pictures, and videos to Hayes via Facebook messenger.     However, upon reviewing the results from the aforementioned search warrant, those messages were not present, which indicates that Hayes likely deleted them. If not also deleted by J. Amnott from the Subject Account, these messages would also be located within records from Subject Account.

31.     All messages between Hayes and Amnott are relevant, as the full social relationship between Amnott and Hayes is relevant to the entirety of the investigation. For example, as located in the search warrant results from Hayes's Facebook Account, on April 26, 2018, Jennifer Amnott messaged (via Facebook) a communication referencing an individual by the name of "Ro," which the FBI assesses to be a reference to Ronan, the name Hayes used to refer to one of the targets of the alleged kidnapping.

32.     Moreover, in its investigation, law enforcement has received information from multiple sources that Hayes represented to Frank and Jennifer Amnott that she would facilitate an adoption for them.     On one occasion, Frank and Jennifer Amnott named their anticipated child "Amelia." Corroborating this information, on February 14, 2017, Jennifer Amnott used the Subject Account to publicly post an announcement that "Amelia" would be arriving soon.

14



## TECHNICAL BACKGROUND REGARDING FACEBOOK

33.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

34.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by

sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users

16

the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

39.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

42.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories

and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's

18

support services, as well as records of any actions taken by the provider or user as a result of the communications.

48.　As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.　In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.　This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.　Further, Facebook account activity can show how and when the account was accessed or used.　For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.　Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services.　Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.　This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.　Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.　For example, information on the

19

Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51.     Based on the forgoing, I request that the Court issue the proposed search warrant.

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

53.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the Court is one "that – has jurisdiction over the offense being investigated."

18 U.S.C. § 2711(3)(A)(i).

## **OATH**

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Stephen J. Duenas*
Stephen J. Duenas
Special Agent - FBI

Received by reliable electronic means and sworn and attested to by telephone on this 31st day of

January 2020.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the **Facebook User ID 730591804**, which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)  All contact and personal identifying information for Facebook user ID name "Jennifer Amnott" and user ID number "730591804" including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from September 1, 2016 to Present;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them September 1, 2016 to Present, , including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)   All other records and contents of communications and messages made or received by the user from September 1, 2016 to Present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)   All "check ins" and other location information;

(h)   All IP logs, including all records of the IP addresses that logged into the account;

(i)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)   All information about the Facebook pages that the account is or was a "fan" of;

(k)   All past and present lists of friends created by the account;

(l)   All records of Facebook searches performed by the account from September 1, 2016 to Present;

(m)   All information about the user's access and use of Facebook Marketplace;

(n)   The types of service utilized by the user;

(o)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 days** of the issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1201; 1512; and 924 involving Jennifer Amnott, Valerie Hayes Perfect, Frank Amnott, Gary Reburn, and other co-conspirators since September 1, 2016, including, for each user ID identified on Attachment A, information pertaining to the following matters:

> (a) Communications and photographs by the user Jennifer Amnott and others related to the investigation of her criminal activities involving a conspiracy to kidnap and trafficking in children, to kill witnesses, and flee the United States.
>
> (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
>
> (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
>
> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS

## PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b. such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                Signature